UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:17-cr-251

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| Vs. | ) | ORDER |
| | ) | |
| **TIMOTHY LAMONT CLOUD,** | ) | |
| Defendant. | ) | |

**THIS MATTER** is before the court on defendant's Motion to Suppress. Having considered defendant's motion and reviewed the pleadings, the court enters the following Order.

I.     **Background**

On April 7, 2017 at approximately 10:36 p.m., Charlotte-Mecklenburg Police ("CMPD") Officers R.M. Jenkins and Officer Joshua Skipper were on patrol in a marked police car as part of a violent crime task force unit in the W. Sugar Creek Road/I-85 section of the city of Charlotte, NC. While on patrol the officers drove to the Brookwood Inn, 1200 W. Sugar Creek Road. The officers were aware that task force officers had recently made several firearm and drug-related arrests at the Brookwood Inn from individuals who were sitting in vehicles in the motel parking lot. While driving through the parking lot, the officers noticed a red Dodge Avenger occupied by four people, with no one sitting in the driver's seat, parked on the back right side of the motel. The car was parked outside of Room 110. The parking lot was well lit. As the police drove up, the occupants of the Avenger all stared at the police car and began to roll up the windows of the vehicle.

Officer Jenkins decided to turn around and make a voluntary contact with the individuals in the car. Officer Jenkins parked his police car in a manner that partially blocked the car, which had a car parked on each side of it with ample space to get in and out of the Avenger (though not, as Officer Jenkins testified at a hearing, enough space to easily pull out and leave without skill on the part of the driver). The officers were dressed in their police uniforms and had their weapons holstered. Officer Skipper approached on the passenger side while Officer Jenkins approached on the driver's side of the Avenger. As Officer Jenkins approached the car, he saw the rear left passenger holding the butt handle of a firearm under the front driver's seat. It appeared to him, he testified, that the rear left passenger was attempting to conceal a firearm under a floor mat beneath the driver's seat. Officer Jenkins saw the rear left passenger begin to move the item around some more under the driver's seat. Officer Jenkins then shined his flashlight into where the rear left passenger was seated, and the passenger, later identified as a juvenile named "L.W.," put his hands back on his lap. The officers testified that L.W. and the other occupants of the vehicle were acting nervously.

After Officer Jenkins saw L.W. put a gun under the floor mat under the driver's seat, defendant emerged from Room 110 and began to approach the Avenger. Officer Skipper asked defendant if he had a room in the motel. Defendant said "No," and then got into the driver's seat of the Avenger. Officer Jenkins called for back-up. When at least four other CMPD officers arrived on the scene, Officer Jenkins asked L.W. if he stuck any firearms or drugs under the seat. L.W. replied that he did not put any firearms or drugs under the seat but that he was "just picking up a black and mild [cigar] that he had dropped." Officer Jenkins then asked defendant if there were any firearms or drugs in the vehicle and defendant said, "No."

Defendant then got out of the car and walked away from it. Officer Jenkins did not observe any bulges around his waistband, pockets, or in his hands. Defendant walked away from the vehicle toward Room 110. Officer Jenkins then asked L.W. to get out of the car. Jenkins then asked all of the other occupants to get out. All four passengers got out of the car, and each was paired with an officer.

At this point, defendant was standing at the front of the car, on his cell phone talking to his mother. Officer Skipper attempted to talk with defendant, but defendant refused and instead handed Skipper his phone and asked Skipper to talk to his mother. Skipper took the phone but held it down at his side and continued to talk with defendant. Officer Jenkins then asked him if the car was his car. Defendant responded that it was his mother's vehicle. Officer Jenkins asked defendant for consent to search the vehicle. Defendant immediately said "No," and that he knew his rights. Officer Jenkins then indicated that he would conduct a frisk of the vehicle for weapons.

Officer Jenkins then opened the driver's side rear door and looked under the floor mat under the driver's seat where he had seen L.W. put a gun under the seat. Officer Jenkins found a large revolver under the floor mat. Jenkins then notified the other officers by radio to handcuff each person who had been in the vehicle, including defendant.

Defendant became agitated and stated that he was going to walk off in order to cool down and began to walk to Officer Skipper's right. Officer Jenkins directed Officers Skipper and Ash to detain defendant since he had entered the vehicle and appeared to be in possession and control of the vehicle. Officer Skipper and Officer Ash attempted to detain defendant. Officer Ash gave loud verbal commands for defendant to put his hands behind his back and grabbed defendant's

left hand. Defendant resisted by immediately pulling away from Officer Ash and Officer Skipper. Defendant walked away and, according to one officer, broke into a run through an outside breezeway of the motel. Defendant got about 15-20 feet before officers caught him.

Defendant resisted arrest and fought the officers. The officers had to wrestle defendant while giving him commands to stop resisting. Officer Ash proceeded to OC spray defendant, but he continued to resist. Officer Jenkins then tased defendant, but defendant continued to resist. Eventually, the officers were able to handcuff him. Officer Jenkins informed defendant that he was under arrest for Resisting, Obstructing and Delaying ("ROD") the police. The officers then initiated a search of defendant's person incident to arrest. Defendant continued to resist by spreading his legs, making his pants so tight that officers could not remove items from his pockets. Officers had to physically hold his legs down so they could search him. Defendant again struggled and flexed and pulled his legs away to prevent officers from being able to search his pockets. Defendant finally submitted and told the officers that he had a pistol in his right front pocket. The officers then removed a loaded Smith & Wesson Shield 9mm pistol, serial number HMD7421, from defendant's front right jeans pocket. The pistol was later determined to be stolen. A magazine with 9mm ammunition was recovered from the left pocket.

Defendant was taken to CMC Main Hospital for treatment for his injuries. *En route* to the hospital, defendant remained combative by shaking and kicking while on the medical stretcher, and made multiple threats referring to assaulting the officers. After his discharge, defendant declined to speak with the officers about the incident. Defendant was charged with North Carolina State charges of Possession of Firearm by Felon, Possession of a Stolen Firearm, Carrying a Concealed Weapon and Resisting, Obstructing and Delaying a Police Officer.

On August 16, 2017, a federal grand jury in the Western District of North Carolina indicted defendant on one count of violating 18 U.S.C. § 922(g)(1) for possession of the Smith & Wesson, M&P 9 Shield, 9mm pistol, serial number HMD7421. Defendant's case is set for the May 21, 2018 trial docket. In the instant motion, defendant seeks to suppress the evidence recovered from his pockets on the grounds that defendant's Fourth Amendment rights against unreasonable search and seizure were violated.

**II.     Legal Standard**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. It is well settled that an investigatory detention "must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." Reid v. Georgia, 448 U.S. 438, 440 (1980). See also Terry v. Ohio, 392 U.S. 1, 21 (1968) (holding that a police officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the seizure.]"). Reasonable and articulable suspicion is "some minimal level of objective justification" that must be "something more than an inchoate and unparticularized suspicion or hunch," but is "less demanding than that for probable cause." U.S. v. Sokolow, 490 U.S. 1, 7 (1989) (citations and quotations omitted); see also United States v. Griffin, 589 F.3d 148, 152 (4th Cir. 2009) (holding that officers must have a "particularized and objective basis for suspecting the particular person stopped of criminal activity"); United States v. Black, 707 F.3d 531, 539 (4th Cir. 2013) ("There is no reasonable suspicion merely by association.").

Additionally, under the Fourth Amendment, a person is considered seized if "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he

was not free to leave." United States v. Gray, 883 F.2d 320, 322 (4th Cir. 1989). Both the Supreme Court and the Fourth Circuit have established various factors to consider in determining whether a reasonable person would feel free to leave. Those factors include (i) the number of officers present, (ii) whether officers were in uniform, (iii) whether officers displayed their weapons, (iv) whether officers informed the person that he was suspected of illegal activity, and (v) whether officers attempted to physically block a person's departure or restrain his movement. United States v. Mendenhall, 446 U.S. 544, 554 (1980); Gray, 883 F.2d at 322-23. However, for there to be a seizure, the subject of the purported seizure must acquiesce to authority; otherwise, "'there is at most an attempted seizure,' which is not subject to Fourth Amendment protection." United States v. Stover, 808 F.3d 991, 995 (4th Cir. 2015) (quoting Brendlin v. California, 551 U.S. 249, 254 (2007)). As such, there is a "broad principal that an individual must submit to authority for a seizure to occur." Id. Should the police "not show an unambiguous intent to restrain or when an individual's submission to a show of governmental authority takes the form of passive acquiescence," then the "force or submission test yields to [the] free to leave, totality of the circumstances test." Black, 707 F.3d at 537 (citations and quotations omitted).

**III.    Discussion**

Defendant argues that evidence from the search in this matter must be suppressed, as his seizure was unwarranted due to a lack of a reasonable articulable suspicion on the part of CMPD Officers Jenkins and Skipper. Defendant contends that, while seeing someone in the car attempt to hide a gun may be sufficient to search that person or the car itself, defendant was not in or near the car at that time. As a result, defendant argues that his seizure after emerging from the

hotel was based on reasonable suspicion due to association, which cannot be the basis for a search. Black, 707 F.3d at 539.

The court must disagree. It is true that defendant's car was blocked from being able to easily exit, a number of in-uniform police officers with weapons in view were present, and other factors all combine to suggest that defendant was seized. See Mendenhall, 446 U.S. at 554. However, defendant fails to establish either that the police did not show an unambiguous intent to restrain or that defendant's acquiescence was passive. Paradoxically, at the same time defendant argues that police had unequivocally seized and restrained defendant through the aforementioned Mendenhall factors, defendant also appears to argue that the intent to restrain defendant was ambiguous enough that the principle of attempted seizure articulated in Stover and California v. Hodari D., 499 U.S. 621 (1991), do not apply. Defendant cannot have it both ways. Further, defendant ignored instructions from police to stay put when he got back out of the car and walked to the front of it, refused to speak with Officer Skipper, and then attempted to flee when the police began handcuffing the car's occupants. This can hardly be said to qualify as the kind of "passive acquiescence" seen in cases like Black, where the defendant freely spoke to police and voluntarily offered his identification before attempting to walk away. As such, the court finds that the reasoning in Stover applies to the instant case and that there was, at best, an attempted seizure of defendant and therefore no violation of defendant's Fourth Amendment rights occurred that would warrant suppression of any evidence. See Stover, 808 F.3d at 995-97 (if the police have made a sufficient show of force and defendant's acquiescence was not passive, seizure was merely attempted and the Fourth Amendment's protections do not apply).

Additionally, it is true that, at the time Officer Jenkins first noticed someone in the car attempting to conceal a firearm, defendant was not present. However, as the stop and investigation progressed, defendant became involved by entering the car, and it quickly became apparent to the officers that defendant was the only adult involved at the scene. The reasonable and articulable suspicion was not simply because he happened to be associated with the juvenile; the reasonable and articulable suspicion was based on claiming ownership of the car where someone was attempting to hide a gun, by virtue of being the only adult who could possibly be old enough to legally possess the gun, and other factors like the time of day and location of the incident. This combination of factors suggests that, even if a seizure protected under the Fourth Amendment had occurred, the police had a sufficient reasonable, articulable suspicion to investigate potential criminal activity on the part of defendant. As such, the court sees no reason to suppress evidence found in this matter, and will deny defendant's motion.

**ORDER**

**IT IS, THEREFORE, ORDERED** that defendant's Motion to Suppress (#14) is **DENIED**.

Signed: May 24, 2018

Max O. Cogburn Jr
United States District Judge