**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 20-4091**

———————

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

v.

TIMOTHY LAMONT CLOUD,

        Defendant – Appellant.

———————

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  Max O. Cogburn, Jr., District Judge.  (3:19-cr-00224-MOC-DSC-1)

———————

Argued:  January 27, 2021                        Decided:  April 12, 2021

———————

Before WILKINSON, AGEE and DIAZ, Circuit Judges.

———————

Affirmed by published opinion.  Judge Agee wrote the opinion, in which Judge Wilkinson and Judge Diaz joined.

———————

**ARGUED:**  Megan Coyle Hoffman, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant.  Anthony Joseph Enright, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.  **ON BRIEF:**  Anthony Martinez, Federal Public Defender, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant.  William T. Stetzer, Acting United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

AGEE, Circuit Judge:

A federal grand jury issued a one-count indictment against Timothy Cloud after officers with the Charlotte-Mecklenburg Police Department ("CMPD") arrested him and discovered a stolen firearm on his person. Cloud subsequently moved to suppress that firearm as evidence, arguing that it was the fruit of an unlawful seizure. The district court denied that motion and, for the reasons that follow, we affirm.

I.

A.

At about 10:30 p.m. on April 7, 2017, CMPD Officers Reginald Jenkins and Joshua Skipper were together in a marked police vehicle patrolling the parking lot of the Brookwood Inn in Charlotte, North Carolina, located just off of Interstate 85 between the Sugar Creek and Hidden Valley neighborhoods. As Cloud admits, this area "ha[s] the reputation as being 'crime-ridden.'" Opening Br. 29 (citation omitted). Indeed, both Officers Jenkins and Skipper testified that the area is known for a high volume of drug- and gun-related crimes, and that they had previously made arrests for those types of offenses at the Brookwood Inn. In fact, earlier that month, the officers were assigned to "Operation Anvil," a six-man CMPD unit aimed at reducing drug and gun offenses in "the Sugar Creek and I-85 corridor." J.A. 50, 87. Prior to Cloud's arrest, Operation Anvil had led to two other drug- and/or gun-related arrests at the Brookwood Inn stemming from "people loitering in cars." J.A. 88.

2

B.

That night, Officers Jenkins and Skipper observed a red, four-door Dodge Avenger (the "Dodge") parked head-first in a space about "12 to 15 feet away" from Room 110 at the Brookwood Inn, which is on the ground level. J.A. 57. While cars were parked on both sides of the Dodge, there was "ample space to get in and out" of the passenger doors. J.A. 139. The car was running, had its lights on, and had four occupants—one in the front passenger seat, and one in each of the three rear passenger seats. The driver's seat was unoccupied. When the occupants saw the patrol car drive by, they rolled up the car windows. The officers decided at that point to turn around and make contact with the car's occupants.

Officer Jenkins parked the marked police car eight to twelve feet behind (and perpendicular to) the tail end of the Dodge. He did not, however, leave a clear path for the car's driver to back out of the parking spot. The patrol car's front-end "partially blocked" the Dodge's back end, so there was not "enough space to easily [back] out and leave without skill on the part of the driver." *Id.*; *see also* J.A. 71 (Officer Jenkins explaining that the driver "would have to work some magic to get out of" that parking spot). The police vehicle's emergency light equipment was not engaged.

Officer Jenkins then approached the driver's side of the Dodge, while Officer Skipper approached the passenger's side. Both officers were wearing standard issue CMPD uniforms, and their firearms remained holstered. While the parking lot was generally well-lit, both officers carried their flashlights in their hands.

3

Once Officer Jenkins arrived at the rear driver's side of the Dodge, he testified, "sitting in the back seat was a black male and I saw him holding what I believed to be the – a firearm and I could see the butt end of the firearm." J.A. 55. As Officer Jenkins got closer and shined his flashlight on the individual sitting in that seat, later identified as L.W., he began acting "really nervous" and "feverishly," "tr[ying] to conceal [the firearm] under the driver seat under the floor mat." J.A. 55–56. At that point, Officer Jenkins testified that he had a reasonable articulable suspicion that L.W. was unlawfully carrying a concealed weapon, which he believed established probable cause to search the vehicle for that weapon. *See* N.C. Gen. Stat. § 14-269(a1)(1)–(2), (c) (making it a Class 2 misdemeanor to carry a concealed weapon unless, as relevant here, the person is on their "own premises" or has a concealed carry permit).

During Officer Jenkins' exchange with L.W., Officer Skipper began speaking with a female passenger sitting in the front passenger seat. Unaware of what Officer Jenkins had seen, Officer Skipper began explaining to her "why we were getting out with them"—that they were sitting inside a running vehicle without a driver in a high crime area—and asked if they were staying at the motel. J.A. 91–92. She stated that they were not.

About fifteen seconds after Officer Skipper began talking with the female occupant, and after Officer Jenkins saw L.W. with the alleged firearm, Cloud and his girlfriend exited Room 110. They stood on the wide, covered walkway between the room and the parking lot. Cloud then began to walk towards the driver's side of the Dodge. Officer Skipper asked if he had a room at the Brookwood Inn, to which Cloud responded, "[N]o," J.A. 58, and put his hand on the driver's door handle. Officer Jenkins then asked Cloud, "How's it

4

going?" *Id.* Cloud responded, "Okay." *Id.* Officer Jenkins then began explaining why they had stopped to speak to the car's occupants, but Cloud interrupted to state that the female in the front passenger seat was his daughter, got into the driver's seat of the Dodge, and shut the door. He then "turned his head and acted like he wanted to back out. He looked over his right shoulder and then he looked out the [driver's side] window," but he did not attempt to back out of the space. J.A. 59–60.

With Cloud in the driver's seat, Officer Skipper prepared to walk back to the patrol car because "I didn't see anything, hear anything, and we were just doing a voluntary contact." J.A. 93. But then he heard Officer Jenkins ask the passenger behind the driver's seat what it was that he placed under the seat, so he returned to his original position next to the front passenger's door. L.W. partially rolled the window down and told Officer Jenkins that he had dropped a "Black & Mild" cigarillo on the floor. Officer Jenkins then "continually began asking questions to ask [L.W.], you know, 'Are you sure you didn't put anything down there?'" J.A. 61. Officer Jenkins asked Cloud through the driver's door window if there were any drugs or guns in the vehicle. Cloud responded, "Drugs or guns?" *Id.* Officer Jenkins repeated the question, and Cloud said there were none. While Officer Jenkins spoke with L.W. and Cloud, four more officers in full uniform arrived on the scene.

After telling Officer Jenkins that there were no drugs or guns in the car, Cloud exited the Dodge and walked to the front of it towards the motel room and began pacing up and down the sidewalk while placing a call to his mother. Officer Jenkins asked Cloud to "come back" and "hang out" with the officers, J.A. 290 (Jenkins Body Camera Video at 2:40–50), but Cloud "ignored" his request and continued walking up and down the covered

5

portico of the motel, J.A. 144. Immediately afterwards, Officer Jenkins said "actually, no, he's good," J.A. 290 (Jenkins Body Camera Video at 2:40–50), but asked the Dodge's four occupants to exit the vehicle. As each of the four occupants exited the car, they were paired with an officer. Officer Jenkins realized that they all appeared to be juveniles, leaving Cloud as the only adult associated with the Dodge.

Officer Skipper attempted to explain to Cloud why he and Officer Jenkins were there, but Cloud "refused" to listen "and instead handed Skipper his phone and asked Skipper to talk to his mother." J.A. 140. Officer Skipper took the phone for a few moments, but only held it at his side, and never spoke with Cloud's mother. He then gave the phone back to Cloud, who began speaking on the phone again while pacing on the covered sidewalk without interference or restriction. He walked towards, and eventually past, Officer Skipper while talking on the phone.

Officer Jenkins then asked Cloud who owned the Dodge. Cloud responded that it belonged to his mother. Officer Jenkins asked for consent to search the vehicle, but Cloud immediately refused. Once again asking if there were drugs or guns in the car, Cloud responded, "I don't know what he got on him," and that Cloud was "just driving." J.A. 291 (Skipper Body Camera Video at 4:54–57). Officer Jenkins then told Cloud that he was going to "frisk" the car, but Cloud repeated that Officer Jenkins could not search it. J.A. 290 (Jenkins Body Camera Video at 4:35–51). Officer Jenkins then searched the floor area where L.W. had been sitting and under the driver's seat, where he retrieved the handgun he had seen earlier.

6

During Officer Jenkins' search, Cloud resumed talking on the phone and walked away from Officer Skipper and the Dodge towards a breezeway that led away from the scene. Officer Skipper testified that initially "as [Cloud was] walking away, I'm kind of letting him . . . because I still don't know [what Officer Jenkins has seen]," J.A. 97, meaning that, in Officer Skipper's eyes, Cloud was "free to leave," J.A. 105. But then Officer Jenkins radioed that he found a gun, and ordered that Cloud be detained. Officers attempted to do so, but Cloud resisted and tried to flee, leading to a struggle that required multiple officers to subdue him. Officers then discovered what turned out to be a stolen handgun in Cloud's front right pocket. That stolen handgun formed the basis of the instant federal criminal proceedings against Cloud.

## II.

After his arrest and subsequent indictment for being a felon in possession of a firearm, 18 U.S.C. § 922(g), Cloud moved to suppress the firearm found on his person as evidence, arguing that it was the fruit of an unlawful seizure. According to Cloud, once police officers parked their patrol vehicle behind the Dodge and likely prevented him from backing out of his parking spot, he was "seized" within the meaning of the Fourth Amendment. That seizure was unsupported by a sufficient reasonable articulable suspicion, he posited, because Officer Jenkins' having witnessed L.W. hide a gun under Cloud's seat before he exited the motel room was insufficient to suspect that Cloud was engaged in criminal activity. He argued that since the firearm on his person was only discovered after this unlawful seizure, it must be suppressed. The district court held an evidentiary hearing,

7

in which it heard testimony from Officers Jenkins and Skipper and viewed their bodycam footage.

The district court denied Cloud's motion. J.A. 143–45. The court agreed that the underlying facts—the officers' partially blocking the Dodge, the "number of in-uniform police officers with weapons in view," and "other factors"—"suggest[ed] that [Cloud] was seized." J.A. 144. However, the court ruled that no seizure occurred, because Cloud did not acquiesce to the officers' show of authority. Relying on our decision in *United States v. Stover*, 808 F.3d 991 (4th Cir. 2015), the court found that "at best, an attempted seizure" occurred. *Id.* And even if a seizure did occur, the court further found that there was reasonable articulable suspicion to detain Cloud. J.A. 145.

Cloud subsequently executed a written plea agreement with the Government under which he agreed to plead guilty to a superseding Bill of Information charging him with one count of knowingly possessing a stolen firearm, in violation of 18 U.S.C. § 922(j). The agreement preserved Cloud's right to appeal the denial of his motion to suppress. After the court sentenced Cloud to seventy-four months' imprisonment, he timely filed a notice of appeal. We have jurisdiction pursuant to 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

III.

When a defendant appeals the denial of a motion to suppress, we must view the evidence in the light most favorable to the Government, *United States v. Foster*, 634 F.3d 243, 246 (4th Cir. 2011), and "give 'due weight to inferences drawn from those facts by resident judges and law enforcement officers,'" *United States v. Lewis*, 606 F.3d 193, 197

8

(4th Cir. 2010) (citation omitted). We examine the district court's factual findings for clear error, but review all legal conclusions de novo. *Lewis*, 606 F.3d at 197.

On appeal, Cloud asserts that he was seized within the meaning of the Fourth Amendment during his encounter with police, and that there was no reasonable articulable suspicion attributable to him justifying that seizure. Cloud first argues that officers seized him as soon as they parked their police car behind the Dodge in a way that likely prevented him from leaving. Further, he posits that the officers did so without any reasonable articulable suspicion that he was engaged in criminal activity. In Cloud's view, Officer Jenkins' suspicion that L.W. was unlawfully in possession of a concealed firearm gave Officer Jenkins no reason to suspect that Cloud was either: (1) the owner of that firearm; or (2) also carrying a concealed firearm.

We disagree. As explained below, the Fourth Amendment was not implicated during Cloud's encounter with police on April 7, because he never acquiesced (passively or otherwise) to a show of authority. Further, even assuming that Cloud acquiesced to a show of authority, there was a reasonable articulable suspicion to support the seizure in order to investigate who owned the firearm that Officer Jenkins observed.

A.

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. But not every police-citizen encounter will implicate this prohibition. *See Stover*, 808 F.3d at 995. For example, it is well-settled that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). Such "consensual encounters" demand no

9

inquiry into the reasonableness of the officer's justification for engaging the individual, because the Fourth Amendment is not at all implicated. *See, e.g.*, *United States v. Jones*, 678 F.3d 293, 299 (4th Cir. 2012).

It is equally well-settled, however, that "brief investigatory stops" are "seizures" that implicate the Fourth Amendment. *United States v. Curry*, 965 F.3d 313, 319 (4th Cir. 2020) (en banc). A "seizure," the Supreme Court recently affirmed, occurs when officers employ "'physical force' or a 'show of authority' that 'in some way restrain[s] the liberty' of the person." *Torres v. Madrid*, __ U.S. __, 141 S. Ct. 989, 995 (2021) (alteration in original) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)).

Because Cloud argues that he was seized before officers used force to detain him, we must determine if police made a sufficient "show of authority" to effectuate such a seizure.[1] Our precedent dictates that we make that determination according to the objective test set forth in *United States v. Mendenhall*, 446 U.S. 544 (1980) (plurality opinion). *Stover*, 808 F.3d at 995. Under *Mendenhall*, a show of authority occurs if the totality of the circumstances demonstrates that a reasonable person, measured objectively from an

---

[1] In *Torres*, a majority of the Court declared that "each type of seizure"—a "seizure by control" and a "seizure by force"—"enjoys a separate common law pedigree that gives rise to a separate rule." __U.S. at __, 989 S. Ct. at 1001. As the Court explained, this means that "[u]nlike a seizure by force, a seizure by acquisition of control involves either voluntary submission to a show of authority or the termination of freedom of movement." *Id.* Accordingly, the Court's holding in *Torres* that a woman was seized when officers shot her, despite her failure to yield to that use of force (a "seizure by force"), has no bearing on the issue presented in our case, whether Cloud was seized through an alleged show of authority. *See id.* at 995–96.

10

innocent citizen's perspective, "would have believed that he was not free to leave." 446 U.S. at 554; *Bostick*, 501 U.S. at 438.

That officers employed a show of authority does not alone implicate the Fourth Amendment. As we have observed, "[t]he *Mendenhall* test states a *necessary*, but not a *sufficient*, condition for . . . seizure[s] effected through a 'show of authority.'" *Stover*, 808 F.3d at 995 (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)). For a seizure to occur, the defendant must actually submit to that show of authority. *Id.* (citing *Hodari D.*, 499 U.S. at 628–29). That submission need not be explicit; it can take the form of "passive acquiescence." *Id.* at 996. Whatever form it takes, "'without actual submission' to the police, 'there is at most an attempted seizure,' which is not subject to Fourth Amendment protection." *Id.* (alteration omitted) (quoting *Brendlin v California*, 551 U.S. 249, 254 (2007)). If a person acquiesces to an officer's show of authority, thereby giving rise to a seizure, then we must consider whether the officer had a reasonable articulable suspicion of criminal activity to justify the seizure. *E.g.*, *United States v. Kehoe*, 893 F.3d 232, 237 (4th Cir. 2018).

## B.

### 1.

We begin with analyzing whether a reasonable person in Cloud's position would have felt free to leave the scene or otherwise terminate the encounter with police. This is a question of law that we review de novo, *Jones*, 678 F.3d at 299, and whether a reasonable person would have felt free to leave requires a holistic analysis of the totality of the circumstances of the encounter, *Mendenhall*, 446 U.S. at 554; *Jones*, 678 F.3d at 299

11

(quoting *Bostick*, 501 U.S. at 439). Our cases have enumerated six broad, non-exclusive categories of facts that may be relevant: (1) how many officers were present; (2) whether officers were in uniform and/or displayed firearms; (3) whether any officer touched the defendant or made any attempt to block or restrain his movement; (4) if the officer's questioning was "'conversational' rather than 'intimidating'"; (5) whether the officer informed the defendant that he suspected him of illegal activity, or treated the encounter as "routine"; and (6) if the officer asked for identification, how quickly the officer returned it to the defendant. *United States v. Gray*, 883 F.2d 320, 322–23 (4th Cir. 1989); *see also, e.g.*, *Jones*, 678 F.3d at 299–300.

Cloud argues that based on a number of these factors, Officers Jenkins and Skipper seized him as soon as they parked their patrol vehicle behind his car. We disagree, because even if the parked vehicle alone constituted a "show of authority," there is no evidence that Cloud was aware of it, much less acquiesced. True, even "an unintended person may be the object of the detention" caused by an intentional show of authority, *Brendlin*, 551 U.S. at 254 (alterations and internal quotation marks omitted) (quoting *Brower v. County of Inyo*, 489 U.S. 593, 597 (1989)), but the relevant inquiry is whether "a reasonable [person] would have perceived that the show of authority was at least partly directed at him," *id.* at 261. Here, Cloud was still inside of Room 110 when the officers parked the patrol vehicle, and there is no evidence that he saw it until he left the motel room. Without evidence that Cloud perceived any alleged show of authority prior to exiting the motel room, the mere act of parking the patrol car was of no constitutional significance to him. *Id.*; *see also United States v. Salvucci*, 448 U.S. 83, 86 (1980) ("[A]ttempts to vicariously assert

violations of the Fourth Amendment rights of others have been repeatedly rejected by [the Supreme] Court.").

However, Officers Jenkins and Skipper did eventually make a constitutionally significant show of authority as to Cloud. After they arrived—and notably, shortly after Officer Jenkins witnessed L.W. hide a firearm under the Dodge's driver's seat—Cloud voluntarily exited Room 110 and inserted himself into the scene by sitting in the Dodge's driver's seat. When he did so, neither Officer Jenkins nor Officer Skipper retreated from their respective positions on each side of the car and continued to focus their flashlights on the Dodge's occupants. Further, while Officer Jenkins' initial interaction with Cloud was an exchange of mere pleasantries, as Cloud continued to sit in the driver's seat, Officer Jenkins began asking Cloud (and continued asking L.W.) questions about the presence of guns or drugs in the car.

Given this factual progression, we agree with Cloud that a reasonable person would have concluded that he was not free to leave at that point, and that any effort to have the officers move the patrol vehicle in order to facilitate an easier exit would have been met with an objection. *See Stover*, 808 F.3d at 996–97 (holding that officers made a show of authority when they followed a defendant's car into a parking lot, activated their patrol car's emergency equipment, blocked the defendant in by parking directly behind him, and eventually drew their weapons); *Jones*, 678 F.3d at 296–98, 302–04 (holding that officers made a show of authority by parking their marked patrol vehicle behind the defendant's car in the defendant's driveway, immediately proceeding to the driver's side of the defendant's car, and demanding that he lift up his shirt and consent to a patdown).

13

2.

As we have made clear, however, that Officers Jenkins and Skipper made a show of authority towards Cloud does not itself equate to a seizure. Rather, Cloud must show that he acquiesced to that show of authority. *Stover*, 808 F.3d at 995–96. Ascertaining when, if at all, a defendant acquiesces to a show of authority "can be a difficult, fact-intensive inquiry," for "what may amount to submission depends on what a person was doing before the show of authority." *Id.* at 996 (alteration omitted) (quoting *Brendlin*, 551 U.S. at 262). Accordingly, our precedent dictates that the question of acquiescence is a factual one that we review only for clear error. *Id.* at 998 ("[T]he district court did not clearly err in finding that Stover had not submitted[.]").

We observed in *Stover* that "a range of conduct exists between the 'passive acquiescence' in *Brendlin* and the headlong flight in *Hodari D.*" *Id.* And within that range, the same facts can have varying legal significance based on context. For example, a person's mere movement within a scene of police activity generally neither establishes nor eliminates acquiescence. But in certain contexts, like a traffic stop, a person's *lack* of movement within a scene of police activity can be enough to indicate his acquiescence to the show of authority by police. *Brendlin*, 551 U.S. at 262 (explaining that a passenger in a car "had no effective way to signal submission while the car was still moving, but once it came to a stop he could, and apparently did, by staying inside"); *see also, e.g.*, *Jones*, 678 F.3d at 303–04 (defendant seized after officers made consecutive "requests" for him to lift up his shirt and to consent to a patdown); *United States v. Black*, 707 F.3d 531, 536–38 & n.3 (4th Cir. 2013) (finding a submission to police authority where the defendant,

14

surrounded by a group of police officers, was "extremely cooperative" with officers, volunteered his identification badge, which an officer then pinned to his uniform, and remained at the scene while other officers frisked the other individuals present).

The circumstances in *Stover* are instructive and illustrate the need to "draw the line between submission and non-submission in the face of an individual's equivocal reaction to police acts initiating a show of authority." 808 F.3d at 999. There, officers parked their patrol vehicle three feet behind Stover's parked car, blocking him in. *Id.* at 993. Stover exited the driver's side of the vehicle and opened the driver's side passenger's door. *Id.* at 994. Officers ordered him to get back into his car, but Stover walked towards the front of his car. *Id.* At least one officer ran to the front of Stover's car with his gun drawn, "caus[ing] [Stover] to acquiesce" and drop what officers discovered was a firearm. *Id.* Stover then complied with the officers' orders to get back into his vehicle. *Id.* We held that Stover did not acquiesce until after dropping his firearm, because his "initial action was not to cooperate with police and answer their questions," but was to "disobey[] a police order to return to the car, and instead walk[] away from the police with a loaded gun in his hand." *Id.* at 999. "Only after he discarded that gun and was confronted by an armed police officer did Stover submit to police authority." *Id.*

Cloud asserts that he passively acquiesced to Officers Jenkins' and Skipper's show of authority by remaining in the vicinity of the motel and answering their questions.[2] To

---

[2] According to Cloud, the Government has "waived any argument that [he] did not submit to police authority" by failing to develop its argument in its response brief. Reply Br. 3 n.1. While we have recognized that the Government's "outright failure" to address

15

the contrary, we find no clear error in the district court's determination that, as in *Stover*, Cloud never intended to, or did in fact, yield to Officers Jenkins and Skipper or any of the other police officers.

Immediately upon exiting Room 110 and approaching Officer Jenkins, Cloud ignored Officer Jenkins' initial efforts to explain why he and Officer Skipper were speaking with the Dodge's occupants, and only offered the unprompted remark that one of the passengers was his daughter. After answering Officer Jenkins' initial questions, Cloud then exited the Dodge and went to the front of the car, ignoring Officer Jenkins' order to hang back with one of the other officers.[3] He instead decided to focus his attention on calling his mother while he freely moved around the motel sidewalk without hindrance or restriction. At one point, Cloud—again unprompted—gave Officer Skipper his cell phone and directed him to talk with his mother. Officer Skipper used this opportunity to ask Cloud

an appellant's argument for reversal "would ordinarily result in waiver," *Alvarez v. Lynch*, 828 F.3d 288, 295 (4th Cir. 2016), that result is not valid here. Though the Government's response brief is not overly expansive on this point, it does address it, and argues for the district court's "well founded" rationale. Response Br. 21–22.

[3] Cloud asserts that the district court clearly erred in finding that he "ignored" this request. J.A. 144. We discern no such error, as Cloud's challenge is merely one of semantics. Officer Jenkins' body camera footage shows that Cloud was, at most, one car length away from him when he gave that order. Although Cloud's back was facing Officer Jenkins, he spoke loudly enough that Cloud would have heard the order. Instead, Cloud decided to focus his attention on calling his mother. It was thus not unreasonable, let alone clearly erroneous, for the court to find that Cloud ignored Officer Jenkins. *See United States v. Martinez-Melgar*, 591 F.3d 733, 738 (4th Cir. 2010) (explaining that we may reverse a factual finding "only . . . where the factual determination[] [is] not supported by substantial evidence" (citation and internal quotation marks omitted)).

16

a few questions about who occupied Room 110, which Cloud answered,[4] but Cloud shortly thereafter terminated this sequence by taking the phone back from Officer Skipper. He then resumed his phone conversation with his mother and walked away from Officer Skipper again without restraint or hinderance. Only when Officer Jenkins announced the retrieval of the gun under Cloud's seat and police sought to detain him did Cloud resist and attempt to flee. The crux of Cloud's pattern of conduct here is the same that compelled affirmance in *Stover*: Cloud's "initial action was not to cooperate with police and answer their questions," but instead to "disobey[] a police order" to hang back with an officer, and conduct himself the way that he, not police, desired. 808 F.3d at 999.

Cloud argues that our decision in *Black* "controls," and that it compels a finding that "[o]nce police asked [him] if there were drugs or weapons in the car," he was seized. Opening Br. 18, 20–21. We are not persuaded. The "highly material" fact that transformed the encounter into a seizure in *Black* was when the officer involved took Black's identification card and pinned it to his uniform as another officer frisked the other men in the group. 707 F.3d at 538. Throughout the encounter, Black was "extremely cooperative"

---

[4] Cloud also argues that the district court made a contrary, clearly erroneous finding: that throughout the entire encounter, Cloud "refused to speak with Officer Skipper." J.A. 144. But the court made no such finding. Read in its proper context, the district court found that after Cloud exited the Dodge and proceeded to pace the sidewalk unrestricted while speaking with his mother on the phone, Officer Skipper "attempted to talk with [Cloud], but [Cloud] refused and instead handed [Officer] Skipper his phone and asked [Officer] Skipper to talk to his mother." J.A. 140. Officer Skipper's body camera footage verifies this chain of events. That Cloud later answered some of Officer Skipper's questions does not negate the fact that Cloud initially "refused" to engage with Officer Skipper and, instead, directed him to speak on the phone with his mother. *Id.* We thus discern no clear error in this regard.

17

with officers and remained sitting where he was when officers arrived on the scene, thereby demonstrating his passive acquiescence to their show of authority. *Id.* at 535–37 & n.3.

There is no similar "highly material" factor analogous to *Black* here as Cloud's consistent, unfettered movement reflects. That Cloud, like the defendant in *Black*, answered some of the questions Officers Jenkins and Skipper posed to him does not render the district court's conclusion as to acquiescence clearly erroneous. In some contexts, an individual's decision to answer questions that police pose can be probative evidence that he has passively acquiesced to police authority. *Compare, e.g.*, *id.* at 535–38 & n.3, *with United States v. Wilson*, 953 F.2d 116, 123 (4th Cir. 1991) (holding that, despite the defendant's earlier willingness to answer police questioning and consent to being searched, no seizure occurred until police continued to question him after he "had conveyed an unequivocal unwillingness to engage in further conversation"). But here, the record amply supports the view that Cloud did not feel compelled to answer the officers' questions, as he selectively chose which to answer, and which to ignore. Indeed, far from the "extreme[] cooperat[ion]" that signaled passive acquiescence in *Black*, 707 F.3d at 536–37 & n.3, Cloud ignored police orders and moved about the scene without restraint, hinderance, or regard to the officers' presence.

Especially in cases like this one, "we must be mindful of a trial court's superior vantage point" in making factual findings. *United States v. White*, 549 F.3d 946, 951 (4th Cir. 2008). Unlike appellate courts, district courts observe the live testimony of the officers and other individuals involved in an encounter, which allows them to make a community-specific assessment of "inflections and demeanor, [as well as] the human dimensions and

18

the practical demands in the situations before them." *United States v. Johnson*, 599 F.3d 339, 344 (4th Cir. 2010). Here, based on the record currently before us, and giving the district court the deference it is owed in making this "context-sensitive judgment," *id.*, we are convinced that Cloud did not acquiesce to a show of authority by police. We may affirm the judgment on this ground alone.

C.

Even if we agreed with Cloud that he was seized prior to being physically restrained by the police, they had a reasonable articulable suspicion that he was engaged in criminal activity sufficient to warrant his investigatory detention. We review this issue de novo. *United States v. Williams*, 808 F.3d 238, 244 (4th Cir. 2015).

Officers must have some "reasonable, articulable suspicion" that an individual is engaged in criminal activity before making an investigatory detention. *Id.* at 245 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). The reasonable suspicion standard "is a commonsensical proposition." *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993). It is "a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence," but requires at least "more than an inchoate and unparticularized suspicion or hunch of criminal activity." *Wardlow*, 528 U.S. at 123–24 (internal quotation marks omitted) (quoting *Terry*, 392 U.S. at 27). We require that officers "either articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance." *Williams*, 808 F.3d at 246 (quoting *Foster*, 634 F.3d at 248). That suspicion must also provide "a *particularized* and objective basis

19

for suspecting *the particular person stopped* of criminal activity." *Wingate v. Fulford*, 987 F.3d 299, 305 (4th Cir. 2021) (citations omitted). But in the end, "[t]he reasonable suspicion inquiry 'falls considerably short' of 51% accuracy, for . . . '[t]o be reasonable is not to be perfect." *Kansas v. Glover*, 140 S. Ct. 1183, 1188 (2020) (second alteration in original) (internal citations omitted).

We review the totality of the circumstances of a particular encounter to determine whether officers had a reasonable articulable suspicion to perform an investigatory detention, looking at the factors supporting the detention both individually and holistically. *See United States v. Arvizu*, 534 U.S. 266, 273 (2002); *Williams*, 808 F.3d at 247. In that analysis, we owe deference to the reasonable inferences that both the trial court and the officers involved drew from the underlying facts. *See Ornelas v. United States*, 517 U.S. 690, 699 (1996) ("A trial judge views the facts of a particular case in light of the distinctive features and events of the community; likewise, a police officer views the facts through the lens of his police experience and expertise. The background facts provide a context for the historical facts, and when seen together yield inferences that deserve deference."); *accord Lender*, 985 F.2d at 154 ("Courts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the street.").

The district court's reasonable suspicion determination rested on four factors: (1) Officer Jenkins' having seen L.W. hide a firearm under Cloud's seat; (2) Cloud's claim of control over the Dodge; (3) Cloud being the only adult associated with the Dodge; and (4) "the time of day and location of the incident." J.A. 145. Applying the principles noted

20

above, we are satisfied that under these circumstances, the police officers had a reasonable articulable suspicion of criminal activity particularized to Cloud sufficient to detain him.

First, within fifteen seconds of approaching the Dodge to interact with the passengers, Officer Jenkins observed L.W. conceal a firearm under the Dodge's driver's seat. This activity, if substantiated in court, could prove unlawful. While North Carolina is an *open* carry state (making it lawful to carry a firearm in plain sight in a public place), it specifically outlaws the *concealed* carrying of firearms in public places without a permit. N.C. Gen. Stat. § 14-269(a1)(1)–(2), (c). Such direct observation of potentially unlawful activity is plainly relevant to a finding of reasonable suspicion. *See, e.g.*, *Terry*, 392 U.S. at 27–28.

Second, armed with that contextual knowledge, Officer Jenkins then immediately observed Cloud voluntarily exit the Brookwood Inn and place himself in the Dodge's driver's seat—the very seat under which L.W. hid the firearm. At this point, the "commonsense . . . inference[]" for police to draw was that Cloud was the owner, or at least the one exercising dominion and control over, the Dodge. *Glover*, 140 S. Ct. at 1188 (quoting *Wardlow*, 528 U.S. at 125). Indeed, Officer Jenkins later confirmed this fact by asking Cloud whose car it was. Cloud affirmed that it was his mother's.

Cloud's control and possession of the car is especially significant, for it entitled officers to infer that L.W. could have been handling a firearm that belonged to the occupant of the Dodge's driver's seat: Cloud. North Carolina courts "have held consistently that the 'driver of a borrowed car, like the owner of the car, has the power to control the contents of the car.'" *State v. Best*, 713 S.E.2d 556, 562 (N.C. Ct. App. 2011) (quoting *State v.*

21

*Hudson*, 696 S.E.2d 577, 583 (N.C. Ct. App. 2010)). Such power over a borrowed car "is sufficient, in and of itself, to give rise to the inference of knowledge and possession [of a controlled substance within the car] sufficient to go to the jury." *Id.* (quoting *Hudson*, 696 S.E.2d at 583). Following that logic, the *Best* court observed that the presence of a firearm in a borrowed car "standing alone, might be sufficient to permit a reasonable inference that [the driver] possessed the firearm in question." *Id.*; *cf. Maryland v. Pringle*, 540 U.S. 366, 371–72 (2003) (holding that probable cause existed to arrest all of a vehicle's occupants after police discovered cocaine and money over which no occupant claimed possession). Suffice it to say that, at minimum, North Carolina law permitted officers to infer that Cloud could have been the owner of a firearm stored under his seat in a car that he controlled.[5]

Third, later on in the encounter when Officer Jenkins ordered the remaining passengers to exit the vehicle, it became obvious that all of the passengers were juveniles. This fact only cements the reasonableness of the officers' suspicions regarding Cloud, because in order to qualify for a concealed carry permit under North Carolina law, a person must be over the age of twenty-one. N.C. Gen. Stat. § 14-415.12(a)(2). So not only were

---

[5] Attempting to erect a strawman, Cloud cites our decision in *Black* for the argument that any potentially illegal conduct that L.W. engaged in cannot be attributed to him. That argument fails to withstand examination. In the relevant portion of *Black* that Cloud relies upon, we rejected officers' reliance on the so-called "Rule of Two," an assumption that because one individual was (lawfully) in possession of a firearm, someone else in his group must also be in possession of one. 707 F.3d at 540–41. But nowhere in the record is this concept ever put forward as a justification; it is purely a creation by Cloud. The issue here was that police suspected that Cloud was the *owner*, or had dominion and control, of the gun that Officer Jenkins saw L.W. hide under Cloud's seat. "Although common sense suffices to justify this inference," as we have explained above, "[North Carolina law] reinforces that it is" a reasonable one. *Glover*, 140 S. Ct. at 1188; *see Best*, 713 S.E.2d at 562.

22

officers already justified in suspecting that the firearm hidden under the driver's seat may have been Cloud's given his dominion and control over the Dodge, but now that justification grew stronger, given that Cloud was the only one who could have potentially purchased or possessed the firearm through legal means.

Finally, the fact that the encounter took place at night in a high-crime area is a relevant factor in the totality of the circumstances analysis. Of course, as we have long recognized, presence in a high-crime area at night is not itself sufficient alone to give rise to reasonable suspicion of criminal activity. *See, e.g.*, *Wingate*, 987 F.3d at 306; *Curry*, 965 F.3d at 331; *Black*, 707 F.3d at 542. But as Officers Jenkins and Skipper uniformly testified, the Brookwood Inn is located in between two crime-laden neighborhoods on the I-85 corridor (the Sugar Creek and Hidden Valley neighborhoods), and the motel itself is known for having a high propensity for drug- and gun-related crime. So much so, in fact, that Operation Anvil, a specialized CMPD task force designed to reduce drug- and gun-related crime around the Sugar Creek neighborhood, encompassed that motel. Additionally, Officer Skipper testified that Operation Anvil had recently produced two gun- and/or drug-related arrests at the Brookwood Inn stemming from individuals loitering in cars. Officers Jenkins and Skipper, and the district court by extension, were thus well-justified in considering this factor as part of the totality of the circumstances. *See Wardlow*, 528 U.S. at 124 ("[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation."); *Lender*, 985 F.2d at 154 (deeming as relevant both the facts that

23

"officers personally knew that the area they were patrolling had a large amount of drug traffic," and that the defendant was present in that area "at nearly 1:00 a.m.").

Analyzing these facts holistically, we are readily satisfied that the officers had a reasonable articulable suspicion that Cloud may have been the owner, or had dominion and control, of the firearm that L.W. hid under Cloud's seat in the Dodge. As Officer Jenkins admitted, after searching the Dodge and finding the gun, he "didn't know" whether the firearm was Cloud's or not—all he knew was that "there's a firearm in a vehicle with four kids and one adult. Juveniles can't possess firearms or even purchase one." J.A. 78. Nor did officers know whether Cloud was in conformance with North Carolina's concealed carry laws at that moment. In these rapidly evolving circumstances—in which the danger to police officers was heightened by the presence of a firearm within Cloud's and L.W.'s reach while each remained in the Dodge—nothing in our precedents required Officers Jenkins and Skipper to merely "shrug [their] shoulders" to the reasonable possibility that the firearm was Cloud's, and that Cloud was illegally concealing that firearm. *Lender*, 985 F.2d at 154 (alteration in original) (quoting *Adams v. Williams*, 407 U.S. 143, 145 (1972)); *see also Arvizu*, 534 U.S. at 277 ("A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct."). Accordingly, even if Cloud was seized at some point before or after he exited the Dodge, there was a particularized and reasonable articulable suspicion supporting his investigatory detention, meaning that the eventual seizure of the firearm found on Cloud's person was lawful.

24

IV.

For these reasons, the judgment of the district court is

*AFFIRMED.*

Case 3:17-cr-00251-MOC-DCK    Document 51    Filed 04/12/21    Page 25 of 25